SM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gabriela Giambalvo,<br>  Plaintiff,<br>v.<br>City of Tempe, et al.,<br>  Defendants. | No.   CV-22-01856-PHX-SMB (JFM)<br><br>**ORDER** |

Plaintiff Gabriela Giambalvo, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). Defendants move for summary judgment. (Doc. 65.) The Motion is fully briefed. (Docs. 70, 73).

The Court will grant the Motion for Summary Judgment.

**I.   Background**

Plaintiff sues the City of Tempe ("the City") and Tempe Police Department (TPD) Officer Anthony Nardini for alleged constitutional and statutory violations arising out of Plaintiff's November 7, 2020 arrest. (Doc. 1.) Plaintiff brings the following claims against Defendants: an ADA claim against the City in Count One; an RA claim against the City in Count Two; a wrongful arrest claim under the ADA and the RA against the City in Count Three; and a wrongful arrest claim under § 1983 against all Defendants in Count Four. (*Id.*)

. . . .

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

. . . .

. . . .

. . . .

**III.    Relevant Facts**

On November 7, 2020, at approximately 12:14 a.m., Defendant TPD Officer Nardini initiated a traffic stop after witnessing Plaintiff engage in three separate moving violations: (1) failure to come to a complete stop before turning on to University Drive in Tempe; (2) making two lane changes on University without signaling; and (3) making a wide right turn into the second lane of traffic onto McClintock Blvd.  (Doc. 67, Defs.' Statement of Facts (DSOF) ¶ 1; Doc. 67-2 at 3.)  Plaintiff does not challenge the legitimate basis of the traffic stop.  (DSOF ¶ 39; Doc. 71 at 12, PSOF ¶ 39.)

As Defendant Nardini approached Plaintiff's car, Plaintiff pointed to her ear. (DSOF ¶ 3; Defs.' Exh. 1, DVD at 0:00:30–0:00:48.)  Defendant Nardini asked Plaintiff if she was "deaf or hard of hearing" both verbally and with hand gestures.[1]  (DSOF ¶ 4; DVD at 0:00:30–0:00:48.)   Defendant Nardini is not a certified American Sign Language interpreter through the City of Tempe.  (Doc. 71 at 15, Pl.'s Statement of Facts (PSOF) ¶ 2.)  Plaintiff responded verbally that she was "hard of hearing."  (DSOF ¶ 5; DVD at 0:00:30–0:00:48.)  Plaintiff was wearing a hearing aid, and it was not dead at the time. (DSOF ¶ 6; Doc. 71 at 3, PCSOF ¶ 6.)

Defendant Nardini observed that Plaintiff displayed multiple signs of possible drug impairment, including dilated pupils, rebound reaction to light, lack of convergence, and eyelid tremors.  (DSOF ¶ 14.)  At one point in the investigation, Plaintiff told Defendant Nardini that she has balance issues, so Plaintiff completed the field sobriety tests with her shoes off.  (*Id.* ¶ 13; Defs.' Exh. 1, DVD at 11:29.)  Plaintiff asserts that her balance issues are related to the condition that causes her hearing impairment.  (Doc. 71 at 5, PCSOF ¶ 13.)  About 20 minutes into the investigation, Defendant Nardini placed Plaintiff under arrest for suspicion of drug DUI.  (DSOF ¶ 14; Defs.' Exh. 1, DVD at 18:00.)

---

[1] Plaintiff disputes that Defendant Nardini's hand gestures were actual American Sign Language ("ASL") and that Plaintiff recognized his gestures as ASL.  (Doc. 71 at 2, Pl.'s Controverting Statement of Facts (PCSOF) ¶ 4.)

After being seated in the patrol car, Plaintiff asked Defendant Nardini if she could have an interpreter. (DSOF ¶ 17; Defs.' Exh. 1, DVD at 0:19:35–0:20:05.) Defendant Nardini responded: "Sure, yeah. I mean I know quite a bit of sign language. That's why I was signing to you before. So I can sign to you if there's anything you don't understand that you're having difficulty with, then I can get online and have a digital interpreter also, ok?" (*Id.*) Defendant Nardini never used a digital interpreter during his encounter with Plaintiff. (Doc. 71 at 7–8, PCSOF ¶ 21.) Plaintiff verbally acknowledged that she understood her Miranda rights. (DSOF ¶ 28; Defs.' Exh. 1, DVD at 0:58:00.)

According to the body worn camera (BWC) footage,[2] Defendant Nardini's encounter with Plaintiff totaled approximately two-and-a-half hours; Plaintiff was placed under arrest approximately 20 minutes into the encounter. (*See* Defs.' Exh. 1, DVD at 0:00:30–2:23:42.) The battery in Plaintiff's hearing aid died approximately one hour and twenty minutes into the encounter, while Plaintiff was undergoing a Drug Recognition Exam (DRE). (*Id.* at 1:19:00; DSOF ¶ 33.) Prior to that, except for a few minutes where audio was not available (Defs.' Exh. 1, DVD at 0:03:04–0:10:07), the BWC footage shows that Plaintiff consistently communicated with Defendant Nardini verbally in English, answered Defendant Nardini's questions, and followed his various instructions during the investigation. (*See id.* at 0:00:30–1:19:00.)

During the DRE, Plaintiff informed Defendant Nardini that the battery in her hearing aid was dead, so Defendant Nardini skipped that portion of the investigation. (DSOF ¶¶ 33–34; Defs.' Exh. 1, DVD at 1:19:00.) After her hearing aid died, Plaintiff relied on lipreading to understand Defendant Nardini. (Doc. 71 at 15, PSOF ¶ 4.) Plaintiff

---

[2] At summary judgment, the Court must take as true the facts as depicted in the video of an incident. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"). To the extent either parties' facts contradict what is clearly shown in the BWC, the Court will construe that facts "in the light depicted by the videotape." *Id.*

read and signed her charges, and was released after about two hours in custody. (DSOF ¶ 36; Defs.' Exh. 1, DVD at 2:19:45-2:21:30.)

The BWC footage shows that, throughout her encounter with Defendant, Plaintiff would verbally and physically indicate her understanding of what Defendant Nardini was saying. (*See generally* Defs.' Exh. 1, DVD.) When Plaintiff asked Defendant Nardini to repeat or explain something, Defendant Nardini would repeat it verbally, through hand gestures, or by pointing it out to Plaintiff on the relevant document. (*See id.*) Plaintiff complied with Defendant Nardini's instructions during the field sobriety tests, and she responded to his questions concerning her activities and her drug use that day. (*See id.*) The footage also shows that when Defendant Nardini determined that Plaintiff's hearing impairment would not allow him to complete certain parts of the investigation, Defendant Nardini skipped those portions of the investigation. (*See, e.g.*, *id.* at 1:19:00, 1:49:56.)

Plaintiff ultimately pleaded guilty to two moving violations in exchange for dismissal of the remaining charges, including the DUI charge. (DSOF ¶ 37.)

Audiologist Dr. Douglas S. Zavos examined Plaintiff on November 9, 2020—two days after her arrest—and he assessed that:

> [Plaintiff] has a Mondini malformation of the cochlea in the right ear and has been fit with a cochlear implant. She is not using the implant which renders that ear dead. Her left ear shows a moderate sensorineural hearing loss in the low frequences sloping to severe in the highs. Her speech understanding is excellent with amplification. When she is not wearing her hearing aid on her left ear, normal conversational speech may be audible but will lack discrimination. . . . Due to the nature of the hearing loss, [Plaintiff] may be aware of someone speaking but would not be able to discriminate words at normal conversational speech levels (60 decibels) without amplification.

(Doc. 71-5 at 2, Pl.'s Exh. F.)

The City's Interpreter Policy states that during "lengthy or complex transactions," an interpreter may be necessary for a deaf or hard-of-hearing person "if the person being interviewed normally relies on sign language or speech reading to understand what others

are saying." (Doc. 71 at 15, PSOF ¶ 3.) The Interpreter Policy states that, for misdemeanors like a DUI, "Officers may question deaf/hearing impaired suspects about the incident up to the point where it is necessary that the Miranda Warnings be administered. At that point the questioning will cease." (*Id.* at 16, PSOF ¶ 8.) The policy further states, "Officers will not advise deaf/hearing impaired persons of their rights either verbally or in writing because the person's comprehension cannot be adequately established." (*Id.*) Defendant Nardini completed the City's required training and acknowledged its policies related to interacting with deaf and hard-of-hearing members of the public. (*Id.* at 17, PSOF ¶ 18.)

TPD Officers can use a software application called Voiance, recently renamed CyraCom, to contact virtual interpreters in the field. (*Id.* at 16, PSOF ¶ 12.) Defendant Nardini was aware of this app when he encountered Plaintiff. (*Id.*) Defendant Nardini administered Miranda Warnings to Plaintiff without an interpreter present, and he continued questioning Plaintiff after administering Miranda Warnings and without an interpreter present. (*Id.* ¶¶ 10–11.) After Plaintiff requested an interpreter, Defendant Nardini did not offer Plaintiff a sign language interpreter or ask if she needed one for the rest of their interaction; Plaintiff did not receive an interpreter for the duration of her interaction with Defendant Nardini. (*Id.* ¶¶ 15–16.)

**IV.   ADA Claim**

Courts have recognized two types of Title II ADA claims related to arrests: a wrongful arrest theory and a reasonable-accommodation-during-arrest theory. *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015). Under the first theory, police are alleged to have wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. *Id.* Under the second theory, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Id.*

With respect to the wrongful arrest theory, the evidence does not show that Defendant Nardini arrested Plaintiff "because of legal conduct related to [her] disability." *See Lawman v. City & Cnty. of San Francisco*, 159 F. Supp. 3d 1130, 1147 (N.D. Cal. 2016) ("To prevail on a theory of wrongful arrest under the ADA [a plaintiff] must prove that (1) he was disabled; (2) [the arresting officer] knew or should have known he was disabled; and (3) [the arresting officer] arrested him because of legal conduct related to his disability."). There is no dispute that Plaintiff was disabled and that Defendant Nardini knew Plaintiff was disabled at the time of the arrest. However, the undisputed evidence shows that, even construing the facts in Plaintiff's favor, at a minimum, Plaintiff was arrested because she committed multiple moving violations, including failing to come to a complete stop, making two illegal lane changes, and making a wide turn. Where any potential crime is supported by probable cause, the arrest is justified. *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir.2010); *Barry v. Fowler*, 902 F.2d 770, 773, n.5 (9th Cir. 1990); *Lacy v. Cnty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008). Thus, the stop and Plaintiff's arrest were not by reason of Plaintiff's disability, but because of her objectively verifiable misconduct. *See Lerma v. City of Nogales*, No. CV 12-518-TUC-FRZ, 2014 WL 4954421, at *18 (D. Ariz. Sept. 30, 2014) (concluding that arresting a mentally ill plaintiff for trespassing into a warehouse did not constitute wrongful arrest under ADA because the trespass was not lawful conduct); *Krakauer v. Flagstaff, City of*, No. CV 20-08090-PCT-GMS (ESW), 2022 WL 4118663, at *23 (D. Ariz. June 6, 2022) (finding that plaintiff's ADA claim based on false arrest failed because Plaintiff "was arrested for obstructing a roadway and aggravated assault, not for legal conduct related to his disability"); *see also Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir.2000) (in a case where a mentally ill individual came at police with a knife, finding that the plaintiff had not made out an ADA claim based on wrongful arrest theory because his conduct was actually unlawful activity); *J.H. ex rel. J.P. v. Bernalillo Cnty.*, No. CIV

12-0128 JB/LAM, 2014 WL 3421037, at *81 (D.N.M. July 8, 2014), *aff'd*, 806 F.3d 1255 (10th Cir. 2015) ("For the wrongful arrest theory to apply, the conduct that is mistaken for criminal activity must actually be lawful.").

Turning next to the reasonable accommodation theory, Plaintiff must show: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her disability. *Sheehan*, 743 F.3d at 1232-33. The record does not support this theory either.

In a similar case, this Court determined that "[t]he [ADA] requirement that entities provide effective communication does not mean that a deaf individual is entitled to an interpreter every time they ask for it; instead, 'the test is whether an individual has received an auxiliary aid sufficient to prevent any 'real hindrance' in her ability to exchange information.'" *Mayfield v. City of Mesa*, No. CV-22-02205-PHX-JAT, 2023 WL 7018051, at *6 (D. Ariz. Oct. 25, 2023). In *Mayfield*, the plaintiff, who was deaf, was pulled over for "weaving," and the officer was unable to obtain an ASL interpreter. *Id.* at * 1. During the investigation, the officers communicated with the plaintiff "using various methods including text messages, rudimentary letter-signing, and handwritten notes, to conduct the routine elements of a potential DUI stop." *Id.* After reviewing the body camera footage, this Court determined that the plaintiff in that case "failed to show both that she was not provided 'reasonable accommodations' and that she suffered a greater injury than other arrestees." *Id.* at *6.

Likewise, the BWC footage in the instant action shows that "Plaintiff repeatedly indicated that she understood the communications officers made to her." *Id.* Plaintiff's own expert concluded that Plaintiff's "speech understanding is excellent with amplification" (Doc. 71-5 at 2, Pl.'s Exh. F), and, with the exception of a few minutes that lacked audio, the video footage shows that during the time leading up to Plaintiff's arrest,

Plaintiff's hearing aid was working, and she was able to communicate with Defendant Nardini and follow his instructions. Plaintiff's hearing aid continued working for the next hour of the investigation, and she continued to communicate with Defendant Nardini and follow his instructions during the sobriety tests. After Plaintiff's hearing aid died, Defendant Nardini continued communicating verbally, through hand gestures, and by pointing to text on the relevant documents Plaintiff was signing. When Plaintiff had trouble hearing Defendant Nardini, Defendant Nardini would repeat himself, or skip that portion of the investigation if repeating himself did not work. On this record, "[t]he body camera footage indicates that Plaintiff suffered no 'real hindrance' in her ability to exchange information[.]"

For the foregoing reasons, summary judgment will be granted to Defendants as to Plaintiff's ADA claim.

**V.     RA Claim**

To make a prima facie claim for violation of the RA, a plaintiff must show the following: (1) she is disabled within the meaning of the RA; (2) she is otherwise qualified for the benefit or services sought; (3) she was denied the benefit or services solely by reason of her disability; and (4) the program providing the benefit or services receives federal financial assistance. *Lovell v. Chandler*, 303 F. 3d 1039, 1052 (9th Cir. 2002) (citation omitted). For the same reasons as stated in dismissing Plaintiff's ADA claim, Defendants are entitled to summary judgment as to Plaintiff's RA claim. *See Mayfield*, 2023 WL 7018051, at *6 (citing *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F. 4th 858, 867 (9th Cir. 2022) (analyzing both ADA and RA claims under the same framework)).

**VI.    Section 1983 Claims**

    **A.     Defendant Nardini**

To prevail on a Fourth Amendment wrongful arrest claim, a plaintiff must be able to show that there was no probable cause for the search or seizure. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (citation omitted). Probable cause exists when an officer has reasonably trustworthy information of facts and circumstances

that are sufficient to justify the belief that an offense has been or is being committed. *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (citing *Brinegar v. United States*, 338 U.S. 160, 175−76 (1949) (internal quotation marks omitted)). "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes. *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).

When determining whether probable cause exists, the Court looks to the totality of the circumstances known to the arresting officer at the time of the arrest. *Id.* (internal quotation marks and citation omitted). "In applying these standards, [the Court] must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest." *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975). Where any potential crime is supported by probable cause, the arrest is justified. *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir.2010); *Barry v. Fowler*, 902 F.2d 770, 773, n.5 (9th Cir. 1990); *Lacy v. Cnty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008).

It is undisputed that Plaintiff committed the moving violations for which she was stopped, and Plaintiff does not dispute the legitimacy of the traffic stop based on these traffic violations. Even though Defendant Nardini was aware that Plaintiff was hard-of-hearing, based on the facts available to him at the time—including Plaintiff's driving behaviors, her physical symptoms, and her performance on the sobriety tests—Defendant Nardini had reasonably trustworthy information to justify his belief that Plaintiff's driving behaviors may have been caused by her being under the influence of a substance rather than as a result of her hearing impairment. *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) ("Once probable cause to arrest someone is established . . . a law enforcement officer is not 'required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.'"). As previously stated, where any potential crime is supported by probable cause,

the arrest is justified. *Bingham*, 341 F.3d at 952. Here, the totality of the circumstances could have still led a reasonable officer to believe that Plaintiff was driving while impaired by drugs, and Defendant Nardini was not required to investigate Plaintiff's potential contributing medical conditions prior to arresting her on suspicion of driving under the influence. *See State v. Moran*, 307 P.3d 95, 99 (Ariz. App. 2013) ("Although [plaintiff] contends his medical conditions and other circumstances could have accounted for some of the apparent signs of impairment observed by [the arresting officer], we conclude a reasonably cautious person would find it probable that [plaintiff] was driving while impaired by alcohol to the slightest degree."); *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (an arresting officer is "not required to make a full investigation into [a] plaintiff's state of mind prior to taking action."). Further, the fact that the DUI charge against Plaintiff was eventually dismissed has no bearing on the Court's determination. *Hughes v. Fraley*, No. CV 16-00403-TUC-EJM, 2017 WL 1550448, at n.7 (D. Ariz. May 1, 2017) (acknowledging that "even if the [underlying] charge against Plaintiff was eventually dismissed, this does not obviate the existence of probable cause at the time of the arrest"); *Hansen v. Garcia, Fletcher, Lund & McVean*, 148 Ariz. 205, 207 (App. 1985) ("A subsequent dismissal of the charges does not make an arrest made with probable cause unlawful.").

Based on the foregoing, Plaintiff's Fourth Amendment wrongful arrest claim against Defendant Nardini must be dismissed.[3]

**B.     City of Tempe – Failure to Train**

A city may be sued under § 1983 for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). To establish municipal liability under *Monell*, a plaintiff must show that his or her constitutional injury was caused by employees acting pursuant to the government entity's policy or custom. *Monell*, 436 U.S. at 690–94; *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964

---

[3] The Court will not address Defendant Nardini's qualified immunity argument.

(9th Cir. 2008). This requires the plaintiff to show (1) a constitutional deprivation; (2) that the entity had a policy or custom; (3) that the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). Moreover, to succeed on a failure-to-train claim against a municipality, a plaintiff must show that the defendant "disregarded the known or obvious consequence that a particular omission in their training program would cause [government] employees to violate citizens' constitutional rights." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (emphasis added) (internal quotation marks and citation omitted). As discussed above, Plaintiff's arrest was supported by probable cause, and the record evidence does not support a Fourth Amendment violation. Because the facts do not show a constitutional deprivation, the § 1983 claim against the City must be dismissed.[4]

**IT IS ORDERED** that the reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 65), and the Motion is **granted**. The action is terminated with prejudice, and the Clerk of Court must enter judgment accordingly.

Dated this 1st day of August, 2024.

_____
Honorable Susan M. Brnovich
United States District Judge

---

[4] To the extent Plaintiff brings a failure-to-train claim under the ADA and RA, that claim is also analyzed under the *Monell* framework and must be dismissed. *See Mayfield*, 2023 WL 7018051, at *7 (analyzing ADA and RA failure-to-train claims under *Monell* framework); *Bauer v. City of Pleasanton*, No. 19-CV-04593-LB, 2021 WL 2224016, at *19 (N.D. Cal. June 2, 2021) ("Assuming that a failure-to-train claim is cognizable [under the ADA], the training claim fails for the reasons that it fails under *Monell*."); *Green v. Tri-City Metro. Transp. Dist.*, 909 F. Supp. 2d 1211, 1220 (D. Or. 2012) (analogizing an ADA claim for failure-to-train with a claim brought under § 1983 because the Ninth Circuit has not set out a standard for failure-to-train claims under the ADA).